Aline B. DAY, Plaintiff,

v.

**SNOWMASS STABLES, INC., a Colorado Corporation, Big Sky Leatherworks, a Montana Company, and the Evener Shop, an Ohio Company, Defendants.**

Civ. A. No. 92–B–609.

United States District Court,
D. Colorado.

Jan. 14, 1993.

Bruce E. Rohde, Davis & Ceriani, P.C., Denver, CO, for plaintiff.

Geoffrey S. Race and Suanne M. Dell, Weller, Friedrich, Ward & Andrew, Denver, CO, for Snowmass Stables, Inc.

Douglas I. McQuiston, Law Offices of Taylor, McQuiston & McCune, Aurora, CO, for Big Sky.

Michael D. Plachy, Rothgerber, Appel, Powers & Johnson, Denver, CO, and John R. Waltman and Steven J. Shrock, Schuler Law Firm, Critchfield, Critchfield & Johnston, Millersburg, OH, for Evener Shop.

## MEMORANDUM OPINION AND ORDER

BABCOCK, District Judge.

Defendant The Evener Shop (Evener) moves to dismiss for lack of personal jurisdiction and defendant Snowmass Stables Inc., (Snowmass Stables) moves for summary judgment. The issues are adequately briefed and oral argument will not materially aid in their resolution. Evener's motion will be GRANTED and Snowmass Stables' motion will be DENIED for the reasons set out below.

### I.

Plaintiff Day was injured during a wagon ride conducted by Snowmass Stables. Before the ride Day signed a form titled, "Release, Acknowledgment of the Risks, Acceptance of Responsibility." Day was a passenger in the first of two horse-drawn wagons which were proceeding down a dirt road. While both wagons were moving, the neck yoke ring on the rear wagon broke. When the ring broke it allowed the rear wagon to move forward freely, bumping its team of horses which then bolted. The rear wagon collided with the first wagon as it passed the first wagon. Day was thrown from the first wagon and injured.

Day filed a complaint against three defendants: Snowmass Stables, the concessioner; Big Sky Leatherworks (Big Sky), supplier of the neck yoke ring to Snowmass Stables; and Evener, manufacturer of the neck yoke ring.

### II.

Evener filed a motion to dismiss for lack of personal jurisdiction arguing that the exercise of jurisdiction would violate Colorado's long-arm statute and the due process clause of the Fourteenth Amendment to the United States Constitution because Evener does not have "minimum contacts" with Colorado and Evener did not "purposely avail" itself of Colorado laws. I agree.

A plaintiff bears the burden of establishing personal jurisdiction over a defendant. *Behagen v. Amateur Basketball Ass'n of the United States,* 744 F.2d 731, 733 (10th Cir.1984), *cert. denied,* 471 U.S. 1010, 105 S.Ct. 1879, 85 L.Ed.2d 171 (1985). Prior to trial, a plaintiff need only make a prima facie showing of jurisdiction. All disputes of fact are to be construed in a light most favorable to the plaintiff. *Id.*

The exercise of personal jurisdiction over a non-resident defendant must satisfy the requirements of the forum state's long-arm statute as well as constitutional due process requirements. *Doe v. National Medical Services,* 974 F.2d 143, 145 (10th Cir.1992). Colorado's long arm statute is coextensive with constitutional limitations imposed by the due process clause. *Mr. Steak, Inc. v. District Court,* 194 Colo. 519, 574 P.2d 95, 96 (1978). Therefore, if jurisdiction is consistent with the due process clause, Colorado's long arm statute authorizes jurisdiction over a nonresident defendant. Under the due process clause of the Fourteenth Amendment, personal jurisdiction may not be asserted over a party unless that party has sufficient "minimum contacts" with the state, so that the imposition of jurisdiction would not violate "traditional notions of fair play

and substantial justice." *Helicopteros Nacionales De Columbia, S.A. v. Hall,* 466 U.S. 408, 414, 104 S.Ct. 1868, 1872, 80 L.Ed.2d 404 (1984) (quoting *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945)).

A. Specific Jurisdiction

■ Specific jurisdiction may be asserted if a defendant has "purposefully directed" its activities toward the forum state, and if the lawsuit is based upon injuries that "arise out of" or "relate to" the defendant's contacts with the state. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472, 105 S.Ct. 2174, 2182, 85 L.Ed.2d 528 (1985) (citing *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 774, 104 S.Ct. 1473, 1478, 79 L.Ed.2d 790 (1984) and *Helicopteros,* 466 U.S. at 414, 104 S.Ct. at 1872). The contacts must be established by the defendant itself. "The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum state." *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1239–40, 2 L.Ed.2d 1283 (1958).

■ In this case, Evener, an Ohio resident, has only two Colorado customers, but the neck yoke ring was sold to Big Sky, a Montana resident. Furthermore, Day's lawsuit is not based on any action of these customers, or on any product sold to them. Evener's sole link with Colorado stems from the unilateral activity of Big Sky. Big Sky's contacts with Colorado cannot be used to impose personal jurisdiction on Evener. *See Helicopteros,* 466 U.S. at 417, 104 S.Ct. at 1873. Accordingly, because Day's alleged injury does not arise out of or relate to Evener's contacts with Colorado, and because in selling the neck yoke ring to Big Sky, Evener did not purposely direct its activities toward Colorado, the exercise of specific jurisdiction over Evener is improper.

B. General Jurisdiction

■ Under general jurisdiction, a nonresident defendant may be subject to a state's jurisdiction even where the alleged injury is unrelated to the defendant's contacts with the forum state. If a defendant's contacts with a state are strong enough, the state may assert jurisdiction over a defendant on any matter, whether or not it arises out of the defendant's contacts with the state. *See Perkins v. Benguet Consol. Mining Co.,* 342 U.S. 437, 446, 72 S.Ct. 413, 418, 96 L.Ed. 485 (1952).

■ For general jurisdiction, a defendant's contacts with a state must be greater than those required for specific jurisdiction. *Doe,* 974 F.2d at 146. General jurisdiction is appropriate only when a defendant has "continuous and systematic" general business contacts with the forum state, *Helicopteros,* 466 U.S. at 415, 104 S.Ct. at 1872, so that the defendant could reasonably anticipate being haled into court in that forum. *See Burger King,* 471 U.S. at 474, 105 S.Ct. at 2183, (citing *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980)).

Here, Evener's contacts with the State of Colorado are insufficient to support general jurisdiction. In reaching this conclusion I rely on two Tenth Circuit cases, *Doe v. National Medical Services,* 974 F.2d 143 (10th Cir.1992), and *Fidelity and Casualty Co. Of N.Y. v. Philadelphia Resins,* 766 F.2d 440 (10th Cir.1985).

In *Doe,* personal jurisdiction was held unavailable in Colorado over National Medical Services ("NMS"), a Pennsylvania corporation which performs drug tests on urine samples. Through a contract with a California company, NMS tested a sample from Doe, a Colorado resident. The positive test results caused Doe to lose his job and he sued NMS for negligence in Colorado. The Tenth Circuit held that specific jurisdiction was not available because NMS had not purposefully established the contacts with Colorado that gave rise to Doe's cause of action.

Similarly, general jurisdiction was also unavailable. Despite having four regular clients based in Colorado for whom NMS had performed nearly 3,500 tests at a cost of $810,000 over a five-year period, the

Tenth Circuit held that NMS lacked "traditional and general business contacts" with Colorado. This conclusion was based on the fact that the samples were not solicited by NMS but, rather, were sent by the Colorado clients to be tested in Pennsylvania.

The jurisdiction analysis in *Fidelity* was determined under Utah law. However, the analysis is helpful because Utah, like Colorado, interprets its long-arm statute to the fullest extent permitted by the due process clause.

In *Fidelity*, an insurer brought a products liability action against the manufacturer of synthetic fiber cables, Philadelphia Resins Corporation ("PRC"), a Pennsylvania Corporation, for injuries sustained when the cable broke. As here, the product was brought into the forum state by a PRC customer from another state. The issue was reduced to the single question, whether PRC had sufficient "minimum contacts" with the state of Utah to establish general jurisdiction. *Fidelity*, 766 F.2d at 442. The Tenth Circuit refused to find that jurisdiction was proper over PRC despite the facts that (1) PRC had ten customers in Utah, amounting to less than one-tenth of one percent of PRC's gross sales, and (2) PRC advertised its products in trade publications, presumably with a national circulation. *Id.* at 447.

■ Evener lacks traditional general business contacts with Colorado. Evener's only contact with Colorado is annual sales averaging less than $700 to two Colorado-based entities, one of which orders, purchases, and receives all its goods in Ohio. (Affirmation of Noah Troyer, paragraphs 13–16). These sales represent less than one-half of one percent of Evener's business. Although Evener advertises in a national trade publication, there is no evidence that Evener advertises by any method specifically directed at the Colorado market, or that the advertising was seen and acted upon in Colorado. *See id.* at 443–47. In addition, Evener has no presence in Colorado. It owns no property and has no agents in this state. Accordingly, I hold that Evener's contacts with the State of Colorado are insufficient to support the exercise of personal jurisdiction over Evener in accordance with the due process clause. Evener's motion to dismiss will be GRANTED.

### III.

Snowmass Stables moves for summary judgment dismissing all claims against it. Day claims Snowmass Stables was negligent because it knew or should have known that the neck yoke ring was faulty and because the wagons were faulty in that they did not have sides or rails to keep passengers from falling out. Snowmass Stables argues that Day's claim of negligence against it is barred by the release signed by Day and by operation of the Equestrian Statute, § 13–21–119, 6A C.R.S. (1992 Supp.). I disagree that Day's claim is barred by the release agreement or by the Equestrian Statute.

### A. Standard for Summary Judgment

Fed.R.Civ.P. 56 provides that summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. The non-moving party has the burden of showing that there are issues of material fact to be determined. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

In reviewing a motion for summary judgment, I must view the evidence in the light most favorable to the non-moving party and all doubts must be resolved in favor of the existence of triable issues of fact. *Boren v. Southwestern Bell Tel. Co.*, 933 F.2d 891, 892 (10th Cir.1991).

### B. The Release

■ In this diversity action, the resolution of this motion turns on Colorado law. *Bauer v. Aspen Highlands Skiing Corp.*, 788 F.Supp. 472, 474 (D.Colo.1992). The determination of the sufficiency and validity of an exculpatory agreement is a question of law for the court. *Jones v. Dressel*, 623 P.2d 370, 376 (Colo.1981).

Exculpatory agreements have long been disfavored. *Heil Valley Ranch, Inc. v. Simkin*, 784 P.2d 781, 783 (Colo.1989). Because of their one-sidedness, exculpatory agreements are strictly construed against the drafter. *Rosen v. LTV Recreational Development, Inc.*, 569 F.2d 1117, 1122 (10th Cir.1978).

Colorado looks to four factors in determining the validity of an exculpatory contract: (1) the existence of a duty to the public; (2) the nature of the service performed; (3) whether the contract was fairly entered into; and (4) whether the intention of the parties is expressed in clear and unambiguous language. *Jones*, 623 P.2d at 376. Day argues that the release she signed fails to meet the third and fourth factors.

Under the third factor, Day argues that the release was not entered into fairly because she was denied an opportunity to read the release. I disagree. In Colorado, in the absence of fraud or concealment, a party signing a contract without reading it cannot deny knowledge of its contents, and is bound by what she signed. *Master Palletizer Systems v. T.S. Ragsdale Co.*, 725 F.Supp. 1525, 1531 (D.Colo. 1989). There is no evidence that Snowmass Stables fraudulently induced Day to sign the release or concealed the contents from her. Moreover, the recreational services offered by Snowmass Stables were not essential and, therefore, they did not enjoy an unfair bargaining advantage. *Bauer*, 788 F.Supp. at 475. Day was free to choose not to go on this ride.

As to the fourth factor, Day argues that the exculpatory agreement does not clearly and unambiguously release the stables from liability for her negligence claim. I agree.

The release Mrs. Day signed provides:
I recognize that there is a significant element of risk in any adventure, sport, or activity associated with the outdoors. Knowing of the inherent risks, dangers and rigors involved in the activities, I certify that my family and I, including any minor children, are fully capable of participating in the activities.

I assume full responsibility for my family and myself, including any minor children, for bodily injury, death, loss of personal property, and expenses thereof.

In consideration of services to be received, the undersigned, for himself and his heirs and assigns, hereby releases the concessioner and the concessioner's employees from any liability for claims or lawsuits brought by the undersigned and arising out of the activities provided by the concessioner.

An exculpatory agreement must be closely scrutinized and in no event will it shield against a claim for willful and wanton negligence. *Jones*, 623 P.2d at 376. A party can, however, shield itself from liability for claims based on its negligent conduct. *Rosen*, 569 F.2d at 1122. Under Colorado law, the use of the specific term "negligence" is not required for an exculpatory agreement to shield a party from claims based on negligence. *Heil Valley Ranch*, 784 P.2d at 785. The inquiry is whether the intent of the parties was to extinguish liability and whether this intent was clearly and unambiguously expressed. *Id.*

The first paragraph of the Snowmass Stables release refers generally to the significant element of risk associated with outdoor activities and the inherent risks, dangers, and rigors involved in the activities. In the second paragraph Day assumes full responsibility for her bodily injuries. The third paragraph releases Snowmass Stables from "any liability for claims or lawsuits ... arising out of the activities provided by the concessionaire."

Day argues that the language does not clearly and ambiguously show that she intended to release Snowmass Stables from liability for its negligent use of faulty equipment. She argues that the risks created by faulty equipment are not "inherent risks" involved in activities "associated with the outdoors." The release is not limited to inherent risks. Rather it expressly applies to any liability for claims "arising out of the activities provided by the concessionaire." Clearly, Day's claim

against Snowmass Stables arose out of her participation in the stable's activities.

However, the Colorado Supreme Court in *Heil Valley Ranch* applied the principal that "when the parties adopt broad language in a release, it is reasonable to interpret the intended coverage to be as broad as the risks that are *obvious to experienced participants.*" *Heil Valley Ranch,* 784 P.2d at 785 (emphasis added). The horse rider in *Heil Valley Ranch* was injured when the horse she was riding reared up and fell backwards onto her. She was acknowledged to be an experienced rider. Furthermore, in the release she acknowledged the specific risk she encountered:

> I acknowledge that the use, handling and riding of a horse involves a risk of physical injury to any individual undertaking such activities; and that a horse, irrespective of the training and usual past behavior and characteristics, may act or react unpredictably at times based upon instinct or fright which, likewise, is an inherent risk assumed by a horseback rider. The undersigned expressly assumes such risk ...

In this case there is no evidence that Day had any experience with horse drawn wagons. Moreover, it is not an obvious risk that, while participating in a horse drawn wagon ride, the wagon team will become spooked because of the failure of a neck yoke ring. The circumstances of this case are sufficiently distinguishable from those in *Heil Valley Ranch* so that upon close scrutiny, I cannot conclude as a matter of law it is sufficient to warrant entry of summary judgment.

### C. The Equestrian Statute

■ Snowmass Stables next argues that summary judgment should be based on the Equestrian Statute, § 13–21–119, 6A C.R.S. (1992 Supp.). The Equestrian Statute grants limited immunity to particular "equine professionals." This immunity is not available to Snowmass Stables because subsection (4)(b)(I)(A) expressly declines to extend the immunity to equine professionals who "provided the equipment or tack, and knew or should have known that the equipment or tack was faulty, and such equipment and tack was faulty to the extent that it did cause the injury." A material issue of fact exists as to whether Snowmass Stables knew or should have known that the equipment or tack was faulty.

Because I find that neither the release or the Equestrian Statute bars Day's negligence claim against Snowmass Stables, I will deny Snowmass Stables' motion for summary judgment. Accordingly, it is ORDERED that:

1) Evener's motion to dismiss is GRANTED;

2) Snowmass Stables' motion for summary judgment is DENIED.